PACKER *v.* THE ROCHESTER AND SYRACUSE RAILROAD COMPANY.

The owner of an island bounded by a river and a branch thereof, agreed with the owners of mills supplied with water from the branch, that it should be closed, and an artificial race through the island substituted therefor; *Held,* That in the absence of any provision to that effect, the mill owners had no right to have a waste-weir in the race in the place of one which had existed in the natural channel.

A waste-weir having been thus constructed without right, the proprietor of adjoining land, upon which the water of the race is thereby discharged, may, to protect himself, close the waste-weir, though not upon his land.

Whether the purchaser of mortgaged premises, at a sale upon foreclosure, is in privity with the mortgagor, so as to be bound by his grants and covenants respecting the land, made after the mortgage, to persons not parties to the foreclosure, or whether he holds by title paramount the estate as held by the mortgagor before the mortgage, *Quere.*

APPEAL from the Supreme Court. The plaintiff brought his action to recover the value of a quantity of wheat, flour, barrels, &c., swept into the Genesee river during a flood and lost, in consequence of the undermining of his mill, on Brown's race, in the city of Rochester, by which its floors fell and the contents of the mill were precipitated into the water. The defendant was charged with having produced this loss by closing a waste-weir in the wall of the race above the plaintiff's mill, by which the surplus water would otherwise have escaped from the race. The defendant set up in its defence a right to close up the waste-weir under a contract to which the plaintiff's grantor was a party, and a decree of the late Court of Chancery founded upon such contract and directing its specific performance in that particular.

At the trial before Mr. Justice WELLES and a jury, it was proved that Brown's race, or that part thereof upon which the plaintiff's mill is situate, was originally constructed in 1816–1818. It then connected, not with the main channel of Genesee river, but with a branch thereof, between which and the main channel lay Mumford's island; the island, main channel and branch being all above the plaintiff's mill. In 1836 Griffith & Selye became the owners of Mumford's island and of the lands and river channels surrounding the same, subject to a mortgage for the purchase money, which was assigned to the Mechanics' Bank of New-York and afterwards foreclosed as hereinafter mentioned. On August 12th, 1836, Griffith & Selye entered into a contract with the mill owners on Brown's race (one of them and one of the parties to the contract being Henry L. Achilles, the grantor of the plaintiff), by which it was agreed that Brown's race, instead of connecting with the branch running around Mumford's island, as it then did, at a point midway between the upper and lower ends of the island, should be carried directly across the branch and the island, by an artificial cut, to the main channel of the river. This involved the building of

walls in the prolongation of the artificial race, which would close the branch on both sides. Griffith & Selye proposed to fill up the bed of the branch above the prolongation of the artificial race, and the right to do so was granted to them by the contract. The mill owners extended the race in accordance with the contract; but in building the walls on the lower side of the race they left a depression, which constituted the waste-weir the subsequent closing of which by the defendant was alleged by the plaintiff to be the cause of the damage for which this suit was brought.

In 1841 Griffith and Everard Peck, who had succeeded to the title of Selye, filed their bill in chancery, claiming that by the true construction of the contract above mentioned, the mill owners were bound to close the waste-weir in the wall on the lower side of the race, by building up the wall, at the point of depression, to the same height above the water as elsewhere; showing special damage to them as the owners of the land below the waste-weir, upon which the water of the race escaped through it, and praying that the defendants be compelled to finish the race by closing up the waste-weir, and be enjoined from permitting the water to flow over the same. The parties defendant to this bill were the surviving mill owners who entered into the contract of August 12, 1836, including Henry L. Achilles, the grantor of the plaintiff, and the representatives of one of them who had died in the interval. A final decree in the suit was made August 31, 1842, declaring and adjudging that the defendants ought specifically to perform the contract of August 12, 1836, as the performance thereof was prayed by the complainants in the bill. It was under this decree and the contract on which it was founded that the defendant, as grantee of Griffith & Peck, justified the closing of the waste-weir.

At the trial, the defendant offered the aforesaid decree in evidence, and it was admitted that Henry L. Achilles, named therein, was, at the time of the making of the decree and of

the commencement of the suit in which it was made, the owner of the mill of the plaintiff in this action, and that the plaintiff derived title from him. By way of further connecting itself with the decree, the defendant proved, in addition to the facts before mentioned, as follows, viz.: The Mechanics' Bank of New-York, March 1, 1842, commenced a suit for the foreclosure of the mortgage executed by Griffith & Selye to Mumford, for the purchase money of Mumford's island and the land and water courses adjacent, before mentioned. None of the mill owners who entered into the agreement of August 12, 1826, nor their grantees or representatives, were parties to this suit. A decree of foreclosure and sale was made, under which the defendant derived title to a lot of land lying on both sides of Brown's race, as extended across Mumford's island by the contract of August 12, 1836, including that immediately below and adjoining the waste-weir closed up by the defendant. The title of the defendant appears to cover the bed of the race and its wall, subject perhaps to the right of the mill owners to the flow of water through the same, but upon this no question was made.

The plaintiff objected to the giving of the decree in evidence, upon the ground that the parties to it were different from those in the present suit and not in privity with them, and that if admitted it did not justify the acts proved against the defendants. The court, sustaining the objection, excluded the evidence, and the defendant took an exception. The defendant then offered in evidence the contract of August 12, 1836, to which the same objections were made. The evidence was excluded and the defendant took an exception. The plaintiff had a verdict and judgment, which on appeal was affirmed by the Supreme Court at general term in the seventh district, and the defendant appealed to this court.

*Henry R. Selden*, for the appellant.

*Selah Mathews*, for the respondent.

Packer *v.* The Rochester and Syracuse R. R. Co.

DENIO, J. If the determination of the appeal depended upon the question whether the defendants stand in legal privity with Walter S. Griffith and Lewis Selye, I should be of the opinion that the Supreme Court was right in its ruling, and that the judgment should be affirmed. By the foreclosure of the mortgage held by the Mechanics' bank and the purchase of the premises at the master's sale, the title which Griffith & Selye had in the premises was destroyed. The purchasers took the title which the mortgagor had before he gave the mortgage. That title passed to the mortgagee by force of the mortgage, and it passed to the purchasers by the foreclosure and sale. The purchasers' chain of title consists, first, in the mortgage by Griffith & Selye to Mumford; then the assignment by Mumford to the bank; the foreclosure sale and master's deed; the legal effect of which, taken together, is equivalent to a conveyance by Mumford to the purchasers and the extinguishment of the equity of redemption which remained in Griffith & Selye. The transactions of these mortgagors after the execution of the mortgage are aside from this deduction of title. The defendants are strangers to these transactions, and are not bound by them if adverse to their interest, and cannot take advantage of them if it would be for their interest to do so. The defendants' counsel have argued that their position is the same as though Griffith & Selye had conveyed to them. This I think is not so. If the mortgage had been released and the defendants had received a conveyance from the mortgagors, or the parties holding the equity of redemption under them, then indeed they would have held under the mortgagors and would have been bound by any estoppel which affected them. But the effect of a foreclosure is quite different from this. Where legal title is concerned, a mortgage, which for many other purposes is a mere chose in action, is a conveyance of the land. The interest remaining in the mortgagor is an equity. The foreclosure cuts off and extinguishes that equity and leaves the title, conveyed by

the mortgage, absolute. Such is precisely the effect of a strict foreclosure. The present practice is not to decree a common law foreclosure, but to order the mortgaged premises to be sold to the highest bidder; but the statute declares that the master's deed upon such a sale " shall vest in the purchaser the same estate, and no other or greater, that would have vested in the mortgagee if the equity of redemption had been foreclosed." ( 2 *R. S.* 192, § 158 ). It proceeds to say that " such deeds shall be as valid as if the same were executed by the mortgagor and mortgagee, and shall be an entire bar against each of them," &c. The effect of this is not to override the former member of the sentence; but it should be construed in harmony with it. At common law no individual or public officer can by his own deed affect another man's land. The statute authorizes a master in chancery to do so, and for this purpose it affirms the validity of the master's deed. When the act says it shall have the same validity as if executed by the mortgagor, it is not to be taken that the purchaser is to be considered as holding under the mortgagor, by title subsequent to the mortgage, in a sense which would subject him to the effect of the mortgagor's acts intermediate the mortgage and the foreclosure. The master's deed may probably be considered, as against the mortgagor, as equivalent to a release of the equity of redemption. There is nothing opposed to this view in the two cases cited by the defendant's counsel from Paige's Reports ( *Vroom* v. *Ditmas,* 4 *Paige,* 526; *Vunderkemp* v. *Shelton,* 11 *id.,* 28.) In this case therefore the equity of redemption was not conveyed, but it was foreclosed and extinguished.

But this foreclosure and extinguishment did not operate upon the interests conveyed by the mortgagors to Warham or Whitney and others by the instrument of August 12, 1836, because these persons were not parties to the foreclosure suit. If the money realised on the sale was sufficient to pay the mortgage debt, Whitney and the others, whom I

Packer *v.* The Rochester and Syracuse R. R. Co

shall for convenience call the mill owners, hold an unincumbered title to the real estate thus conveyed to them. If there is a balance of that debt still unpaid, the mill owners have an estate in that property, subject to the lien of the mortgage for the unpaid balance, which estate is unforeclosed. To apply this state of things to the question of estoppel: both the instrument of August, 1836, and the decree of the Court of Chancery of August 31st, 1842, constituted estoppels operating reciprocally upon the immediate parties. They also ran with the title to the land to which they related, and the grantees of the respective parties were liable to have the estoppel, which the instrument created, set up against them, and were also entitled to take advantage of it. In other words the respective grantees of these parties, immediate or remote, stood in regard to the question of estoppel in the places of the original parties whom they represented by way of privity of estate. But as the purchasers at the master's sale did not hold under the title which Griffith & Selye, or Peck & Griffith, had at the execution of the instrument, or at the time of the decree of 1842, but by title paramount, namely, under the title which Griffith & Selye conveyed by the execution of the mortgage of May, 1836, they are not within the influence of the estoppel.

But there is another aspect to this question, altogether independent of the notion of estoppel, which appears to me to show that the instrument of 1836 ought to have been received in evidence. The wrong attributed to the defendants in this action was the shutting up the waste-weir which had been originally left in the north wall of Brown's race where it crossed the branch or old channel of the river. It was originally built only four feet high at that place, the walls on each side of it being much higher. This enabled the plaintiffs and the other mill owners, by shutting the guard gates just below, to discharge the surplus water into the old channel on the lower side of the race, and thus avoid inconvenience and danger from high water. The

right of the mill owners to have the sluice kept open depends upon the terms and proper construction of the instrument of 1836. Their former right, to waste the surplus water over the dam at that place, must be taken to have been a legal right arising by grant or prescription. But it was only the water running in the branch that could thus be wasted. The instrument of 1836 contemplated that the water should be shut out of the branch, and that it should be made dry land. Griffith & Selye were authorized to run a wall quite across the head where the water ran into it from the Genesee river. Brown's race was to be extended across the branch to the river, and the water was to be taken from the main channel to supply the mills situated on the race. It would not have been positively inconsistent with this arrangement to have provided that a waste-weir should exist in the north wall, to discharge the surplus water; but there is no such express provision in the instrument, and the question is whether one is to be implied. I do not see any ground upon which such an implication can rest. It is true the wall was at first constructed so as to leave a space for the water to be wasted, and this would be some evidence of the understanding of the parties at that time, if their understanding of the matter was at all material; but it did not remain in that condition long enough to establish a prescription. In 1841, only seven years after the date of the instrument, Griffith & Peck, (Peck having acquired the estate of Selye) sued the mill owners in chancery to compel them to build it up and a decree adjudging that they were bound to do so was obtained and acquiesced in. Then the Mechanic's Bank foreclosed the mortgage and became the purchaser of the land upon which the waste-weir stood, and of the ground immediately below through which the channel of the old branch ran; and afterwards, in 1846, the defendants, having purchased these premises of the Bank, built up the wall and destroyed the waste-weir. Without attributing the effect of an estoppel to the decree in chancery, it at

least put an end to any acquiescence on the part of Griffith
& Peck in the continuance of the waste-wier.   The former
right of wasting the water over the dam was put an end to
by the new arrangement.   The instrument by which that
arrangement was made did not provide for any waste-weir.
If, therefore, the present litigation were between Griffith &
Peck on one side and the mill owners on the other, the lat-
ter could not claim the right to continue the waste-weir
except through the instrument referred to, and as that
instrument contains nothing on that subject, either in express
terms or by any fair implication, they cannot insist upon
such a right.

Assuming that the mill owners acquired no right by the
agreement, to have a waste-weir at that place, how can they
prosecute the defendants—the owners of the land imme-
diately below, and upon which the water would fall, and
over which it would run, if suffered to run out of the race at
that place—from stopping up the space and preventing it
from running at all?   The mill owners should have built it
up themselves, and having omitted to do so, the defendants
had a right to do it.   As strangers to the title of Griffith &
Peck, they would have had this right.   If I am the owner
of land bounded on one side by the walls of an artificial
watercourse, lawfully constructed by the owner of the
adjoining premises, the proprietors of the wall must of
course confine the water within the channel which they
have constructed, and cannot claim a right to waste it over
my land.   This is exceedingly plain.   But it may be said,
and it is true, that Griffith & Selye, and afterwards Griffith
& Peck, were the owners of an equity of redemption in the
premises, which the defendants now own, below the waste-
weir; and that although they could grant no rights which
would not be subject to the lien of the mortgage, whatever
rights they did assume to grant can now be asserted, inas-
much as the grantees were not parties to the foreclosure.
Griffith & Peck were seized as to all the world except the

mortgagees and parties claiming under them. They could grant interests in the land which would be indefeasible, except by the foreclosure of the mortgage, not only against the mortgagor but against them. This is all perfectly correct, but if they have not granted a right to waste this water upon the land now owned by the defendants, the principle has no application. If I am right in the construction of the instrument, no foreclosure of the mill owners was necessary.

The only suggestion opposed to this view which I can think of is this: when the mortgage was executed, under the foreclosure of which the defendants obtained their title, the water of the old channel lawfully ran over the dam and on to the land below the present mill, and the then mill owners had a right, by the use of the guard gates or otherwise, to waste it over that dam at their pleasure. Such were the rights of the mill owners when the mortgage was executed, and the defendants' title from Peck & Griffith relates to that date. By the foreclosure the equity of redemption is cut off, and the defendants, as purchasers at the foreclosure sale, cannot avail themselves of any advantages arising under the contract that Peck and Griffith, when the owners of the equity of redemption, made with the mill owners. How, it may be said, can the defendants claim to take advantage of the arrangement which Peck & Griffith made with the mill owners, seeing that the equity of redemption which was the only title which Peck & Griffith had, when they made it, has been cut off by the foreclosure? This would be unanswerable if the mill owners had been made parties and had been foreclosed. But the holder of the mortgage, by omitting to claim a foreclosure against the mill owners, has left them in the enjoyment of all the rights which they acquired by the arrangement with Peck & Griffith. That arrangement, it must be remembered, granted reciprocal rights to Peck & Griffith and to the mill owners, which grants were the consideration of each other. Peck & Griffith acquired, as against the mill owners, the right to

close up the old branch channel. The mill owners got the right to extend the race across that channel to the main channel of the river, and to conduct the water through the race as thus extended. This modification of the former water right totally subverted the old dam. It contemplated that the branch of the river, both above and below where the race crossed it, should cease to be a water course. The river was to be confined within the principal channel. The plaintiff claims, in effect, not only that he should not be disturbed in the rights which he in common with the other mill owners acquired under the agreement (which claim is thus far well founded); but that he and they should retain the rights which they parted with on that occasion, so far at least as concerns the part of the old channel situated below the point where the race crosses that channel. This latter claim is unwarranted. Retaining the enjoyment of all which they acquired by the new arrangement, they have no right to claim that which they relinquished.

These considerations, if warranted, require the reversal of the judgment of the Supreme Court.

PRATT, J. The decree which was offered in evidence determined conclusively, as to the parties to it and their privies, the effect of the contract under which the race was extended across the island to the main channel of the river. By that contract the mill owners secured to themselves the right of continuing the race directly across the island, and of keeping it up forever, for the purpose of conducting the water through it to their mills. This right, affecting essentially the water power for propelling the mills, would manifestly pass with the mills to all subsequent purchasers, and they would be in legal privity with their grantors, and bound by the terms and conditions of the contract as well as by the decree determining its construction and effect.

On the other hand the owners of the island were bound to allow the race to be built and kept open for the purposes

aforesaid, and were entitled to have it constructed according
to the stipulations of the contract. This burden upon the
land, affecting directly the estate, would manifestly pass,
with all the benefits attached to it, to subsequent owners of
the land over which the race was to be constructed. Such
subsequent owners would become privies in estate with
their grantors who were parties to the contract, and subject
to the stipulations and conditions of the contract as deter-
mined by the decree. In fine, the subsequent purchasers
on both sides are privies in estate with their grantors, and
are estopped from denying their mutual rights and interests
as adjudged and declared by the court in the action to
which their grantors were parties.

These general principles do not seem to be contested; but
it is claimed that the defendants are not purchasers subse-
quent to the contract and decree, but that they are prior
purchasers and therefore not in legal privity with the parties
to the contract and to the suit. This is the main question
in the case. It is admitted that the plaintiff holds under
Achilles, who was both a party to the contract and the
decree, and that he owned the mills at the time of the
decree, but it is now claimed that there was no evidence
that he owned them at the time of the contract. It is
answer enough that this point was not taken upon the trial
when the objection was raised to the admission of the con-
tract. The whole case shows that such was undoubtedly
the fact; and had that objection been pointed out it would
have been obviated by proof. The plaintiff must therefore
be deemed as holding under Achilles, who was owner at the
time of the execution of the contract and of entering the
decree.

It is conceded that the defendants are now, and were an-
terior to the time of the injury, the owners of the land at
the point where the race now crosses the old channel,
which belonged at the time of the execution of the con-
tract to parties to that contract. But they hold under a

Packer *v.* The Rochester and Syracuse R. R. Co.

foreclosure and sale upon a mortgage executed prior to the execution of the contract. Upon such foreclosure the plaintiff was not made a party to the suit, although the foreclosure was subsequent to the contract and the decree.

The question therefore becomes narrowed down to the simple point: whether a purchaser under a foreclosure is deemed to take the title of the mortgagor as of the time of the execution of the mortgage or as of the time of receiving the deed. In whatever aspect the question may be viewed I think it is clear that he succeeds to the rights of the owner of the equity of redemption, as of the time of the execution and delivery of the master's deed, at least as against those who have acquired interests intermediate the execution of the mortgage and the foreclosure and sale.

The owner of the equity of redemption, as the law now stands in this state, is vested substantially with the legal title to the land. At common law, a mortgage was held to be a conveyance upon a condition subsequent, vesting the legal title to the land in the mortgagee. And that is still so in England and in many of our sister states. But in this state, both at law and in equity, the mortgagor is vested for all practical purposes with the title, and the mortgagee holds simply a chose in action, secured by a lien upon the land. Since the Revised Statutes, there is not an attribute left in the mortgagee, before foreclosure, upon which he can make any pretence for a claim of title. For the mere right, where he goes into possession by the consent of the morgagor, to retain possession, is not an attribute of title. He would have the same right in the case of a pledge. " A mortgagor or his assignee in possession may maintain trespass against the mortgagee, and if the defendant reply *liberum tenementum,* he may reply freehold in himself. (*Runyan* v. *Mersereau,* 11 *Johns.,* 534.) An outstanding mortgage is not a breach of the covenant of seizin. (*Sedgwick* v. *Hollenback,* 7 *Johns.,* 376; *Stanard* v. *Eldridge,* 16 *id.,* 255.) The mortgagee has no estate in the land capable of being sold or

conveyed. (*Aymar* v. *Bill*, 5 *J. Ch. R.*, 570.) He has no interest capable of being sold under execution. (*Morris* v. *Mowatt*, 2 *Paige*, 586.) He holds only a security for the debt (*Waring* v. *Smyth*, 2 *Barb. Ch. R.*, 119), and before entry is not bound, as an assignee of the mortgagor, of covenants running with the land. (*Id.*) His interest is not subject to dower, but goes to the personal representatives as a personal chattel. "It is taxable as such, and may be conveyed without deed by delivery only." The mortgagor is, for every substantial purpose, the owner of the land, and the mortgagee has merely a lien upon it. (*Astor* v. *Miller*, 2 *Paige*, 68; *Astor* v. *Hoyt*, 5 *Wend.*, 603; *Waring* v. *Smyth*, 2 *Barb. Ch. R.*, 119; *Calkins* v. *Calkins*, 3 *Barb. S. C. R.*, 305; *Gardner* v. *Heartt*, 3 *Denio*, 232.) Judgments against him are liens upon the land, and it may be sold to satisfy them. He may sell it; charge it with other mortgages. He may create easements, or impose other burthens upon it, which can only be removed by foreclosure making the persons interested parties to the suit. His interest descends to his heirs as real estate, and is subject to dower or tenancy by the curtesy. He may create terms for years or for life in it, which will be vested as against the mortgagee until foreclosure. In *Waring* v. *Smyth* (2 *Barb. Ch. R.*, 119) Chancellor WALWORTH said "that a mortgage in this state is nothing but a chose in action or a mere lien or security upon the mortgaged premises, as an incident to the debt itself." So, in *Gardner* v. *Heartt* (3 *Denio*, 232) Justice BEARDSLEY says: "A mortgage creates a specific lien on the mortgaged lands, as a judgment duly docketed does a general one on lands of the judgment debtor. But the mortgagee as such has no title to the land mortgaged; he has neither *jus in re* or *jus ad rem*, but a mere security for his debt, title to the land, notwithstanding, remaining in the mortgagor."

I have only alluded to a portion of the relative incidents belonging to the interests of the mortgagor and mortgagee,

Packer *v.* The Rochester and Syracuse R. R. Co.

and to but a few of the decisions, with which the reports are full, showing that the interest of the mortgagor is for all substantial purposes the legal title, whilst that of the mortgagee is simply a lien; and I should not have deemed it necessary to have cited any, had not some of my brethren come to a different conclusion from my own upon one point in this case. Upon the assumption that the mortgagee is vested with the legal title to the land, I should have been ready to say, in the language of Lord MANSFIELD (*Doug.*, 632), "that it was an affront to common sense" to say that the mortgagor [in this state] is not the real owner.

It is true the language applicable to their interests as they were deemed to exist at common law, is yet often used in regard to their interests as they now exist, but I venture to say that, since the Revised Statutes, not an adjudication can be found in this state where the interest of a third party has depended upon the question whether the mortgagor or mortgagee was vested with the title, in which it has been determined that the estate was vested in the mortgagee and not in the mortgagor. Whenever this question of title has been material it has uniformly been decided both in the law and in the equity courts, that it was vested, for all substantial purposes, in the mortgagor.

The mortgagors, therefore, in this case, holding the title to the premises, granted to the mill owners the right to construct a race across the land, for which they undertook to build the walls where it crossed the channel at a given height. The mill owners, and their successors in estate, by this grant acquired an easement and became liable to perform the conditions attached to it. The mortgagees having a prior lien might, by making the mill owners parties in the foreclosure suit, have terminated their interests, unless they were willing to redeem. But they chose to leave their interests unimpaired, satisfied, perhaps, that the benefits were equal to the burdens, and did not, therefore, make them parties. The mortgage, therefore, stands unforeclosed as to

the rights of the mill owners, but the interest of the mortgagors passed to the purchasers upon the foreclosure; and, *ex necessitate*, it must be deemed to pass as of the time when it was foreclosed. Suppose the whole premises had been purchased upon such foreclosure by the defendants, the right to insist upon the performance of conditions upon which the mill owners were entitled to the easement would clearly have been no longer vested in the mortgagors. It must, therefore, have vested in the purchasers, otherwise the mill owners would hold the easement free from the conditions upon which it was granted to them. Suppose the easement had been granted for a term of years upon the payment of a periodical rent. Would not the purchasers under the foreclosure sale be entitled to the rent? As the covenant to pay rent would in such case run with the land, the mortgagors, after such sale, would not be entitled to it; and if the purchasers were not entitled to it, the mill owners would be enabled to enjoy the easement free from rent. This manifestly could not be. The rent being attached to the land must necessarily, so long as the tenancy continues, belong to the owner of the fee or the reversion. If the tenant is made a party to the foreclosure, his term or tenancy would be subverted by it, and being, after sale, a mere trespasser, rent would no longer exist. But not being made a party, his term would remain unimpaired, but he would be compelled to attorn to the purchaser under the foreclosure and pay rent to him. And this result, manifestly, from the fact that the purchaser would be in legal privity with the lessor. So far as the interest of the mortgagor is concerned it is divested, upon foreclosure, by virtue of the power of sale contained in the mortgage. Under that power the purchaser of course acquires title, not as of the time of the execution of the instrument granting the power, but as of the time of the execution of the power. He does not hold under the grantee of the power, but directly from the grantor.

The same rule applies to a master's sale, where the lien holders subsequent to the mortgage are not made parties, which applied to a sale upon foreclosure by advertisement under the Revised Statutes, and before provision was made for serving notices upon lien holders. (2 *R. S.*, 546.)

In *Vroom* v. *Ditmas* (4 *Paige*, 526.), the chancellor held that, under a foreclosure by advertisement, "the purchaser simply acquires the rights of the mortgagor, so far as he has any, as security for the mortgage debt, and also so much of the equity of redemption as was not bound by the lien of mortgages or judgments." It cannot therefore be doubted, I think, that the defendants in this case should be deemed privies in estate with Selye & Griffith, the mortgagors, and that the contract and decree were competent evidence upon the trial, in determining the rights of the parties.

I have discussed this question somewhat at length because I deemed it one of great interest, and it seemed to me so entirely free from doubt that the decision of the cause might more obviously be placed upon it. But, independent of this point, the judgment of the court below, I think, must be reversed. The injury to the plaintiff was done by the water which flowed through the new race. The plaintiff, or those under whom he holds, built this new race under an agreement with the owners of the land that the banks or walls thereof, where it crosses the channel, should be of the same height as the other portion of the walls. At this height, I understand, the water could not escape into the old channel. the right, therefore, which the mill owners have to take the water through this new race is not connected with any right to a waste-weir at the point where it crosses the old channel. If the water, at the time of the accident, had come down the old channel a different question perhaps might have arisen. But, passing through the new channel, the plaintiff shows no right, in case of an excess, to have it escape through the old channel. And having no such right, it follows that there is nothing upon which he could predicate an action

for damages.   Having no right, he cannot complain of any one for disturbing him in the enjoyment of it.

The judgment must therefore be reversed, and a new trial granted.

COMSTOCK and HARRIS, Js., did not sit in the case; SELDEN, J., expressed no opinion; all the other judges concurred in the decision upon the ground last stated in the preceding opinion, expressing no opinions upon the question of estoppel.

Judgment reversed and new trial ordered.